[Cite as *State v. Taylor*, 2011-Ohio-5080.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 13-10-49

    v.

MEGAN L. TAYLOR,                      O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Seneca County Common Pleas Court**
**Trial Court No. 10CR0143**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:**

APPEARANCES:

    *Randy F. Hoffman and Charles R. Hall, Jr.* for Appellant

    *Derek W. DeVine and Rhonda L. Best* for Appellee

**ROGERS, P.J.**

{¶1} Defendant-Appellant, Megan L. Taylor ("Taylor"), appeals the judgment of the Court of Common Pleas of Seneca County, convicting and sentencing her on two felony counts. On appeal, Taylor argues that the jury verdict was against the manifest weight of the evidence; that she received ineffective assistance of counsel; that the trial court erred in sentencing her for both counts of aggravated trafficking as they were allied offenses; and, that the final judgment entry and the nunc pro tunc judgment entry should be void as the trial court cited the wrong section of the Ohio Revised Code. Finding that the evidence supported the jury's verdict, that Taylor has failed to establish ineffective assistance of counsel, and that the offenses were not allied offenses, we affirm in part the decision of the trial court. Finding that the trial court committed several clerical errors in the judgment entry and erred in awarding restitution, we reverse in part the judgment of the trial court.

{¶2} On July 29, 2010, the Seneca County Grand Jury indicted Taylor on two counts of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(1)(b), felonies of the third degree.[1] The two charges arose from a contract between the Seneca County Drug Task Force and a confidential informant ("CI") which provided that the CI would execute three drug purchases in exchange for

---

[1] The subsection (C)(1)(b) is the additional finding that elevates aggravated trafficking of drugs from a felony of the fourth degree to one of the third degree.

leniency in the CI's pending charges. An arrest warrant was issued for Taylor by the Seneca County Common Pleas Court on August 3, 2010. On August 19, 2010, Taylor appeared at arraignment. On September 24, 2010, Taylor entered a plea of not guilty. On October 28, 2010, the matter proceeded to a jury trial. On count I, the jury rendered a verdict of guilty and made the additional finding that the offense occurred within the vicinity of a juvenile. On count II, the jury rendered a verdict of guilty but did not make the additional finding. On November 23, 2010, the trial court sentenced Taylor to three years in prison for count I and twelve months in prison for count II, to be served concurrently. The trial court imposed restitution in the amount of fifty dollars to the Seneca County Drug Task Force METRICH Enforcement Unit.

{¶3} At trial, the State presented five witnesses, including Detective Donald Joseph, a detective sergeant with the Seneca County Sheriff's Office; Scott Dobransky, a forensic scientist for the Ohio Bureau of Criminal Identification and Investigation; Detective Matthew Armstrong, a detective for the Fostoria Police Department assigned to the Seneca County Drug Task Force; Rachel Eckert ("the CI") the confidential informant; and, Detective Charles Boyer, a unit coordinator for the Seneca County Drug Task Force. The defense presented Appellant Taylor. The State's case in chief adduced the following relevant evidence.

**{¶4}** Detective Joseph testified that he was involved in a controlled buy on November 6, 2009, the subject of which was Megan Taylor. He testified that he received a phone call reporting that the Seneca County Drug Task Force had arranged for a CI to buy five pills of Percocet, which contained Oxycodone, a Schedule II controlled substance, on November 6, 2009 from Taylor. Detective Joseph explained that the buy was to take place at Taylor's residence in Tiffin, Ohio. On November 6, 2009, the CI and her vehicle were searched, the CI was provided $25.00, and was fitted with an audio transmitter and digital recorder which allowed the CI and Detective Joseph to communicate as well as record the transaction. Detective Joseph stated that he followed the CI to the entrance to the mobile home park in which Taylor resided, where he parked, while the CI continued to the residence. He testified that he could hear the CI enter Taylor's residence; that he could hear a conversation between the CI and Taylor; that he could hear children talking; and, that he could hear a conversation about the Percocet. Detective Joseph continued that once the CI returned to the pre-determined location, she gave the suspected Percocet to him, and he conducted a search of the vehicle and of the CI for contraband, finding none.

**{¶5}** Detective Joseph continued to testify regarding the second controlled buy on November 7, 2009. He testified that, at the end of the operation on November 6, 2009, the CI and Taylor arranged for Taylor to sell another five pills

of Percocet to the CI the following day. He testified that, on November 7, 2009, the controlled buy occurred at Taylor's residence, but this time he instructed the CI to stay in her vehicle and have Taylor come outside so that he could obtain a video recording of Taylor to corroborate the audio recording. Detective Joseph explained that he searched the CI and her vehicle for contraband, fitted her with an audio recording device, gave her $25.00, and instructed her to wait down the road from Taylor's residence so as to allow enough time for Detective Boyer to set up a video camera to record the operation. He testified that he heard the CI arrive at Taylor's residence; that he heard children and adults coming and going throughout the trailer park; that he could hear Taylor get into the vehicle; that he could hear the door open and close; and, that he could hear the conversation between the CI and the defendant. After leaving the trailer park, the CI gave the suspected Percocet to the task force agents. Again he searched the CI's person and vehicle for contraband but found none. Lastly, he testified that the pills retrieved from the controlled buys on November 6 and 7, 2009 were sent to the Ohio Bureau of Criminal Identification and Investigation for testing.

{¶6} Rachel Eckert testified that she "had gotten into some trouble" and "as a way to resolve [her] problems," she worked as a CI in Seneca County for about one month. Trial Tr., p. 209. She testified that in consideration for her efforts, she was to receive community control and drug rehabilitation. The CI continued

that she had known Taylor through mutual friends; that she saw Taylor at the Tiffin hospital; that she and Taylor were talking at the hospital when Taylor offered to sell her some Percocet for $5.00 each.  She testified that she informed the Seneca County Drug Task Force that she would be able to buy drugs from Taylor; that she, Detective Joseph, and Detective Boyer set up the operation; that on November 6, 2009, she and her vehicle were searched for contraband; that she was issued $25.00 to purchase the Percocet; that she was outfitted with a recording device; and, that she went to Taylor's residence and made the purchase.  She testified that Taylor's children were in the room with them while she purchased the Percocet, and that the children were under the age of ten.  The CI testified that after she left Taylor's residence, she returned to the pre-determined location and gave the pills and the recording device to the officers.

{¶7} The recording of the buy on November 6, 2009 was played for the jury.  It revealed that Taylor sold the CI five pills of Percocet for $5.00 each. Children's voices could be heard clearly on the audio recording.  Also, the recording revealed that the CI and Taylor agreed to a second sale of Percocet the following day.

{¶8} The CI continued to testify regarding the buy on November 7, 2009. She explained that the same procedure as the first buy was followed except that Detective Boyer took a video recording of the operation outside of Taylor's

residence. The CI testified that once Detective Boyer was set-up, she drove to Taylor's residence but this time remained in her vehicle; that Taylor came out of the residence followed by her son who began riding his bike; that Taylor entered the CI's vehicle; that Taylor sold her five pills she believed to be Percocet for $5.00 a pill; that after the sale the CI returned to the pre-determined location to meet with Detectives Joseph and Boyer; that she turned the pills over to them; that they searched her person and vehicle; and, that no contraband was found as a result of the search. The audio recording from November 7, 2009 was played for the jury.

{¶9} On redirect-examination, the CI testified to the discussion between her and Taylor regarding Taylor selling her the Percocet. The CI explained that she and Taylor had been acquainted for about two years; that, in late October or early November of 2009, she was leaving the hospital after having undergone a procedure; that as she was waiting for her ride, Taylor entered the hospital with one of her children; that the CI and Taylor began talking about the reasons they were at the hospital when Taylor said that she had Percocet to sell for $5.00 each; and, that the two exchanged phone numbers so that she could buy Percocet from Taylor.

{¶10} The video recording taken by Detective Boyer on November 7, 2009 was played for the jury. It showed the CI drive to and park outside Taylor's

residence, Taylor and a child exit the residence, Taylor enter the CI's vehicle, and Taylor's child leave to ride his bike around the trailer park.

{¶11} The State moved to admit its exhibits, which the trial court admitted.

{¶12} The defense then presented Taylor on direct-examination. Taylor testified that she has known the CI for a couple of years; that they have spent time together in the past; that they lost contact when she moved; that she ran into the CI at the hospital; that, at the hospital, the CI was in a wheelchair as she had just undergone a procedure; that the CI looked exhausted and said she was taking Percocet; that she was concerned for the CI because she viewed her as a good friend; that she said she also had Percocet for a recent procedure; that she had her four-year old daughter with her; that a nurse was present for their entire interaction; that she suggested they exchange phone numbers so that they could get together; that she did not offer to sell the CI Percocet because she does not sell drugs; that it was the CI who contacted her about buying Percocet; that it was the CI who suggested to buy five Percocet for $25.00; that she just wanted someone to spend time with because she does not have any friends; that she never had it in mind to commit a criminal offense, but that she just wanted to help out a friend; and, that the CI persuaded her to sell her drugs. Taylor also testified that, on November 7, 2009, her son exited their residence with her and rode his bike to his

grandmother's residence; that her daughter was already at the grandmother's residence; and, that there were no other minor children in the area on that date.

{¶13} On cross-examination, Taylor testified that on November 6, 2009, her children were in the room with her when she sold the CI the Percocet; that she asked the CI if she was interested in a muscle relaxer; that she sold the CI five pills on November 6, 2009 and five pills on November 7, 2009; and, that she received $25.00 on each day.

{¶14} The defense rested.  The jury returned a verdict of guilty on count I and count II, and found that Taylor did commit the offense within the vicinity of a juvenile for count I, but not for count II.  Further, the jury found that Taylor did not prove the affirmative defense of unlawful entrapment for either count.  The trial court accepted the verdicts and subsequently sentenced Taylor to three years' imprisonment for count I and twelve months' imprisonment for count II, to be served concurrently.  The trial court also ordered restitution to be paid to the Seneca County Drug Task Force METRICH Enforcement Unit.  It is from the conviction and the sentence that Appellant brings her appeal, assigning the following errors for our review.

*Assignment of Error No. I*

**THE JURY VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS WAS THE JURY FINDING OF NO ENTRAPMENT**

*Assignment of Error No. II*

**THE APPELLANT WAS DENIED HER RIGHT TO A FAIR TRIAL BY THE INEFFECTIVE ASSISTANCE OF COUNSEL EVIDENCED BY COUNSEL'S OPENING REMARKS**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN SENTENCING APPELLANT FOR BOTH COUNTS IN THE INDICTMENT AS THE COUNTS WERE ALLIED OFFENSES OF SIMILAR IMPORT UNDER ORC 2941.25(A)**

*Assignment of Error No. IV*

**THE TRIAL COURT ERRED IN ITS SENTENCING ENTRY OF NOVEMBER 23, 2010 AND ITS NUNC PRO TUNC ENTRY OF NOVEMBER 24, 2010 BY CITING THE WRONG OHIO REVISED CODE SECTION**

*Assignment of Error No. I*

{¶15} In her first assignment of error, Taylor alleges that the jury verdict was against the manifest weight of the evidence due to the conflicting testimony regarding the initiation of the contact between the CI and Taylor. Taylor also alleges that the jury's finding that there was no entrapment was against the manifest weight of the evidence as the evidence established that the CI had initiated and arranged for the purchases herself.

{¶16} The State contends that the verdict was not against the manifest weight of the evidence in light of the overwhelming evidence favoring Appellant's guilt. We agree.

{¶17} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52, superseded by constitutional amendment on other grounds as stated by *State v. Smith,* 80 Ohio St.3d 89, 684 N.E..2d 668, 1997-Ohio-335, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶18} Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Id. Although the appellate court may act as a thirteenth juror, it should give due deference to the findings made by the fact-finder. *Thompkins*, 78 Ohio St.3d at 388.

{¶19} The jury found Taylor guilty on two counts of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), the first with an additional finding that the offense occurred within the vicinity of a juvenile. R.C. 2925.03(A)(1)

provides that no person shall knowingly sell or offer to sell a controlled substance. The additional finding in subsection (C)(1)(b) provides that if the offense was committed in the vicinity of a juvenile, aggravated trafficking in drugs is a felony of the third degree. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶20} The manifest weight of the evidence presented at trial clearly established Taylor's guilt. As Scott Dobransky, the forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, testified, the pills he received as evidence from the two buys contained Oxycodone, which is a Schedule II controlled substance. For the first sale, the audio recording, the testimony of the CI, the officers, and Taylor, and the drugs admitted as evidence overwhelmingly support the jury verdict of guilty. The audio recording reveals statements made by Taylor that establish that she knowingly sold the drugs to the CI. Taylor stated that she was at first skeptical of the CI as she did not want the CI to turn her into the police, and that she also had other drugs for sale. The testimony of the CI and the officers corroborated that the sale took place. Further, Taylor herself testified that she sold drugs to the CI while her children were in the room. For the second sale, although the audio recording does not reveal a verbal exchange regarding the sale, it does establish that the CI and Taylor had a

conversation about Percocet. The video recording shows Taylor entering the CI's vehicle. Before the sale, the CI and her vehicle were searched for contraband and the CI was given $25.00. After the CI returned from the sale, she turned over the five pills of Percocet. This evidence overwhelmingly established the elements of aggravated trafficking in drugs on both counts.

{¶21} The defense also asserts that the jury's finding of no entrapment was against the manifest weight of the evidence. In *State v. Doran*, the Supreme Court defined the affirmative defense of entrapment as:

> **The defense of entrapment is established where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute.**

*State v. Doran* (1983), 5 Ohio St.3d 187, 449 N.E.2d 1295, paragraph one of the syllabus. In defining entrapment, the Supreme Court adopted a subjective test, which focuses on the predisposition of the accused to commit the offense, emphasizing the accused's criminal culpability and not the culpability of the police officer. Id. at 192. The Supreme Court held that the following matters, although non-exhaustive, are relevant in establishing the issue of predisposition:

> **(1) The accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to [become involved] in criminal activity.**

Id. As entrapment is an affirmative defense, the burden of production and the burden of proof, by a preponderance of the evidence, is on the defendant. Id.; R.C. 2901.05(A).

{¶22} In the present case, Taylor presented evidence through her own testimony that the CI was the one who initiated the discussion of buying Percocet, who followed up with her to buy the Percocet, and who arranged the first and the second sale of the Percocet. Taylor testified that she knew the CI through mutual acquaintances and that a few days before the sales occurred, she ran into the CI at the hospital. Taylor explained that the CI had just had a procedure done and needed pain medication as the doctor did not give her a prescription. Taylor testified that she agreed to sell the CI Percocet because she had some that she was not taking, and because she was in need of friends and saw this as an opportunity to gain a friend.

{¶23} Notably missing from Taylor's testimony is any evidence regarding her predisposition to trafficking in drugs, including any previous involvement or lack thereof, her failure to readily acquiesce to the sale, a lack of knowledge of drug trafficking, or her unwillingness to become involved in criminal activity. Rather, the State presented evidence that Taylor readily sold the CI drugs and even offered to sell her other drugs. Because the defense has failed to produce evidence of Taylor's lack of predisposition, it failed to establish entrapment by a

preponderance of the evidence. Therefore, the jury's finding of no entrapment was not against the manifest weight of the evidence.

{¶24} Accordingly, we overrule Taylor's first assignment of error.

*Assignment of Error No. II*

{¶25} In her second assignment of error, Taylor asserts that she received ineffective assistance of counsel due to the negative statements made by her counsel about her during his brief opening statement, voir dire, and his longer opening statement. Taylor urges that, assuming these remarks are considered trial strategy, they were faulty and created an insulting initial impression, without which, the outcome at trial would have been different.

{¶26} The State contends that counsel's remarks did not amount to ineffective assistance as they were clearly part of his trial strategy to cast her as a lonely individual who was desperate for companionship.

{¶27} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of syllabus. "Reasonable

probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy* (1992), 63 Ohio St.3d 424, 433, 588 N.E.2d 819, superseded by constitutional amendment on other grounds as recognized by *Smith*, 80 Ohio St.3d at 103.

**{¶28}** Furthermore, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Malone* (Dec. 13, 1989), 2d Dist. No. 10564. "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" Id., quoting *Smith v. Murray* (1986), 477 U.S. 527, 535, 106 S.Ct. 2661.

**{¶29}** An appellate court reviewing an ineffective assistance of counsel claim will not second-guess counsel's strategy. *State v. Fritz,* 3d Dist. No. 13-06-39, 2007-Ohio-3138, ¶39, citing *State v. Williams* (2003), 99 Ohio St.3d 493, 794 N.E.2d 27, 2003-Ohio-4396; *State v. Clayton* (1980), 62 Ohio St.2d 45, 402 N.E.2d 1189; *In re Smith*, 3d Dist. No. 9-04-35, 2005-Ohio-149, ¶57, citing *State v. Manley,* 3d Dist. No. 1-01-159, 2002-Ohio-5582, ¶22. Furthermore, tactical decisions, even if debatable, generally, do not constitute a deprivation of effective counsel. *Smith*, 2005-Ohio-149, at ¶57, citing *Manley*, 2002-Ohio-5582, at ¶22.

{¶30} Taylor fails to establish that her counsel's performance was deficient or that it was anything other than trial strategy. Further, Taylor has failed to show that without her trial counsel's statements, the outcome would have been different.

{¶31} Taylor asserts ineffective assistance based on the following statements made by her trial counsel during his mini-opening statement, voir dire, and his opening statement:

> **[Trial counsel]: Megan entertained this [CI] at Megan's white trailer-trash trailer at Brook Park Estates. And Megan has a run – run – running mouth. A machine gun mouth.**

Trial Tr., p. 18.

> **[Trial counsel]: I'm going to be very blunt and very graphic and very explicit with you prospective jurors . . . if it is disclosed to you that Megan Taylor has a libido 10 times greater than Madonna, are you gonna (sic) hold that against her? In other words, she likes sex.**

Trial Tr., p. 81.

> **[Trial counsel]: In that interim, she was left to her own devices and went about living her life as a single homemaker and mother of two young children, struggling, in a white trailer-trash trailer, Brook Park Estates.**

Trial Tr., p. 113.

{¶32} A review of the entire trial transcript and audio recordings reveals that trial counsel made the above statements as part of his trial strategy, which was to cast Taylor as an impoverished, single mother who was struggling to raise children on her own and who was desperate for a friend. His goal was to create

empathy for her while also preparing the jury for what they would hear when listening to the audio recordings. When the audio recordings were subsequently played, the jury heard Taylor discuss the blighted conditions of her home, her lack of social activities and friends, and her affinity for sex.

{¶33} An often-used trial strategy is to preempt the prosecution by introducing harmful character evidence first, thereby lessening its impact. *State v. Baskerville*, 5th Dist. No. 2007 CA 00353, 2008-Ohio-3114, ¶17, citing *State v. Delgado* (June 11, 1992), 8th Dist. Nos. 60587, 60588. We, therefore, cannot say the statements made by trial counsel in his mini-opening statement, voir dire, and opening statement were anything other than trial strategy. Accord *Baskerville* (holding that trial counsel's reference to defendant's criminal history during opening statements did not amount to ineffective assistance of counsel), *State v. Reed*, 8th Dist. No. 93346, 2010-Ohio-1866, ¶60-64 (holding that trial counsel's reference to his client as a "drug dealer" during opening statements did not result in ineffective assistance of counsel).

{¶34} Further, Taylor has failed to establish that, absent the harmful statements, the outcome would have been different, in light of the evidence adduced at trial as discussed in our analysis of her first assignment of error. While we do not dispute that these statements were crass and offensive, and would highly suggest trial counsel find a more eloquent manner of presenting his case, we

cannot say that Taylor received ineffective assistance of counsel due solely to those statements.

{¶35} Accordingly, we overrule Taylor's second assignment of error.

*Assignment of Error No. III*

{¶36} In her third assignment of error, Taylor argues that the trial court erred in sentencing her for both counts in the indictment as they were allied offenses of similar import.  Specifically, Taylor asserts that since the offer to sell drugs was made at the same time the first offense of drug trafficking was committed, her conduct on November 6, 2009 provided the basis for the commission of the crime for both counts.  Since that conduct could result in a conviction on both counts, Taylor claims they are allied offenses of similar import and she can only be convicted and sentenced on one count.

{¶37} The State contends that the trial court did not err as the two counts are not allied offenses.  Specifically, the State asserts that each count was based on different conduct, was a separate transaction, occurred on different occasions, and had a different operation number, and therefore the two counts do not fit the definition of allied offenses under *State v. Cabrales*, 118 Ohio St.3d 54, 886 N.E.2d 181, 2008-Ohio-1625, at ¶14 quoting *State v. Blankenship* (1988), 38 Ohio St.3d 116,117, 526 N.E.2d 816.

{¶38} We initially note that Taylor failed to raise the issue of allied offenses in the trial court, thus waiving all but plain error on this issue. Crim.R. 52(B); *State v. Ward*, 3d Dist. No. 13-10-11, 2011-Ohio-254, ¶23, citing *State v. Holdcroft*, 3d Dist. No. 16-06-07, 2007-Ohio-586, ¶18. In order to have plain error there must be an error, the error must be an obvious defect in the trial proceedings, and the error must have affected "substantial rights." *Ward*, 2011-Ohio-254, at ¶23, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. Plain error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." *Ward*, 2011-Ohio-254 at ¶23, citing *State v. Biros*, 79 Ohio St.3d 426, 431, 678 N.E.2d 891, 1997-Ohio-204.

{¶39} R.C. 2941.25 governs multiple count indictments and provides as follows:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**
> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

**{¶40}** In determining whether two or more offenses should be merged, the intent of the General Assembly is controlling. *State v. Siefer*, 3d Dist. No. 5-09-24, 2011-Ohio-1868, ¶21, citing *State v. Johnson,* 128 Ohio St.3d 153, 942 N.E.2d 1061, 2010–Ohio–6314, ¶46. We determine the General Assembly's intent by applying R.C. 2941.25, which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct. Id. In so determining, the court should conduct the following analysis:

> **In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.**
>
> **If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶50 (Lanzinger, J., dissenting).**
>
> **If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.**
>
> **Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge**.

*Siefer,* 2011-Ohio-1868, at ¶21-22, citing *Johnson*, 128 Ohio St.3d at ¶48-51.

**{¶41}** Here, where Taylor was indicted for and convicted of two counts of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), the two offenses were committed by the same type of conduct. They cannot be said to be allied offenses, however, as each count stemmed from a separate transaction and occurrence on a different date. On November 6, 2009, the CI received five pills of Percocet from Taylor in exchange for $25.00. The next day, the CI received another five pills of Percocet from Taylor in exchange for $25.00. Clearly there was a separate transaction for each count and it cannot be said that the trial court committed plain error by failing to merge the two counts. Accord *Ward*, 2011-Ohio-254, at ¶29.

**{¶42}** Accordingly, we overrule Taylor's second assignment of error.

*Assignment of Error No. IV*

**{¶43}** In her fourth assignment of error, Taylor argues that the sentencing entries should be void as they list the wrong Ohio Revised Code section in violation of R.C. 2929.19(B)(3)(b). While the trial court's judgment entries reflect the correct name of the convictions, aggravated trafficking in drugs, it listed the wrong section number.

**{¶44}** The State acknowledges the mistake, but asserts that the incorrect Code sections in the sentencing entries are the result of a scrivener's error, and as

such, the appropriate procedure is to issue a nunc pro tunc sentencing entry to correct the errors.

{¶45} A review of the record reveals that the indictment charged Taylor with two counts of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(1)(b). The jury ultimately convicted Taylor of two counts of aggravated trafficking in drugs. The jury found that Taylor committed the offense within the vicinity of a child on count I, thus elevating the felony from one of the fourth degree to one of the third degree.

{¶46} The trial court issued a judgment entry dated November 23, 2010, which stated that the trial court found that Taylor was convicted of "[a]ggravated [t]rafficking in [d]rugs with specification (sic)[2], in violation of Revised Code Section 2925.02(A)(1), (C)(1)(b), both being felonies of the Third Degree", and also found that Taylor was convicted of "[a]ggravated [t]rafficking in [d]rugs, in

---

[2] The trial court incorrectly refers to the additional finding as a specification. An additional finding is an additional element that makes an offense one of a more serious degree, or of a lesser degree. R.C. 2945.75(A); OJI-CR 425.25. As with any element of an offense, the additional finding must be proven beyond a reasonable doubt. The necessity of an additional or special finding is determined by examining the specific criminal statute under which the offense is charged, R.C. Chapter 2929, R.C. 2945.75(A), and the averments of the charging document. OJI-CR 425.25 Comment. A verdict form may include the additional finding in the general language of the offense, however, the better practice is to state the special finding separately. For an example see OJI-CR 425.25 and its comments.

A specification, on the other hand, typically refers to a Revised Code section separate from that of the offense. See generally R.C. 2941.14 et seq. A specification is an additional factual question that must be stated separately in an indictment, proven beyond a reasonable doubt, requires separate instructions to the jury for each specification attached to a count of the indictment, and requires a separate finding in the jury's verdict.

violation of Revised Code Section 2925.02(A)(1), (C)(1)(b), being a felony of the [f]ourth [d]egree." Judgment Entry of Sentence, Docket No. 37.

**{¶47}** This was erroneous for three reasons. First, the entry erroneously stated convictions for violations R. C. 2925.*02* rather than *.03*. Second, on the first count, the entry referred to the plural instead of singular form of felony. Third, for count II, the judgment entry erroneously cited subsection (C)(1)(b), which would indicate that Taylor had been convicted of aggravated trafficking in drugs with the additional finding that the offense was committed in the vicinity of a juvenile. In fact, the jury had found that the additional finding was not proven.

**{¶48}** In its nunc pro tunc judgment entry entered November 24, 2010, the trial court corrected the first count to the extent that it changed the wording from the plural to the singular. However, the trial court failed to correct the other errors. It should also have corrected the reference to the subsection from .02 to .03 on both counts, and also should have corrected the Revised Code Section for count II to read R.C. 2925.03(A)(1), (C)(1), deleting the reference to (C)(1)(b), as the jury did not make the additional finding for the enhancement.

**{¶49}** Further, a review of the verdict forms reveals that these also contained errors.

**{¶50}** Both verdict forms read as follows:

> **We, the jury, find the defendant, Megan L. Taylor *_____, of the charge of Aggravated Trafficking in Drugs, a felony of the Third Degree.**
> **(*Insert in ink: guilty or not guilty)**
>
> **We do further find that the defendant ** _____ commit the offense in the vicinity of a juvenile.**
> **(** Insert in ink: did or did not)**

{¶51} However, aggravated trafficking is only a felony of the fourth degree unless the jury makes an additional finding that enhances the offense to an offense of the third degree. Therefore, the verdict forms should not have referred to aggravated trafficking as a felony of the third degree. In count I the jury did make the additional finding, and the conviction was enhanced to a felony of the third degree. But in Count II, the jury did not find that the State had proven the additional finding, so the offense remained a felony of the fourth degree.

{¶52} Despite the innumerable errors in the verdict forms and judgment entries, it cannot be said that Taylor incurred any prejudice, and therefore we hold that her judgment entries are not void. A review of the trial transcript clearly shows that the defense was aware of the charges against Taylor and prepared and presented its defense at trial for the two offenses of aggravated trafficking in drugs and its defense of the additional findings. It cannot be said that the errors were anything other than clerical.

{¶53} "The term clerical mistake refers to a mistake or omission, mechanical in nature and apparent on the record, which does not involve a legal

decision or judgment." *State v. Gutierrez*, 3d Dist. No. 5-10-14, 2011-Ohio-3126, ¶93, citing *State v. Brown,* 136 Ohio App.3d 816, 819-820, 2000-Ohio-1616, 737 N.E.2d 1057 (internal citations omitted). The proper action for the trial court, when faced with a clerical error, is to issue a nunc pro tunc judgment entry that lists the proper Revised Code sections of which Taylor was convicted. See *State v. Junod*, 3d Dist. No. 2-09-03, 2009-Ohio-2817, ¶20, citing Crim.R.36, *State v. Yeaples* (2009), 180 Ohio App.3d 720, 725, 907 N.E.2d 333, 2009-Ohio-184, citing *State ex rel. Cruzado v. Zaleski*, 111 Ohio St.3d 353, 356, 856 N.E.2d 263, 2006-Ohio-5795. According to Crim.R. 36, a clerical error may be corrected by the court at any time. *State v. Wilborn*, 9th Dist. No. 25352, 2011-Ohio-1038, ¶15. Therefore, the trial court's judgment entry should be corrected to replace the reference to R.C. 2925.02(A)(1), (C)(1)(b) with R.C. 2925.03(A)(1), (C)(1)(b) for the first count and replace the reference to R.C. 2925.02(A)(1), (C)(1)(b) with R.C. 2925.03(A)(1), (C)(1) for the second count.

{¶54} Accordingly, we sustain her fourth assignment of error and remand for corrective action consistent with the foregoing analysis.

{¶55} In addition to Taylor's assignments of error, we, sua sponte, address plain error in her sentencing, particularly the trial court's award of restitution to the Seneca County Drug Task Force METRICH Enforcement Unit. In its judgment entry, the trial court ordered Taylor to "pay restitution in the amount of

$50.00 to the Seneca County Drug Task Force METRICH Enforcement Unit, by money order or cashiers check, through the Seneca County Common Pleas Court . . .” Judgment Entry of Sentence, Docket No. 37. This is plain error.

**{¶56}** R.C. 2929.18 governs a trial court's ability to award restitution. The statute provides, in pertinent part:

> **\* \* \* Financial sanctions that may be imposed pursuant to this section include, but are not limited to, the following:**
>
> **Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. \* \* \***

R.C. 2929.18(A)(1).

**{¶57}** This Court has held that the plain language of R.C. 2929.18(A)(1) makes restitution available only to actual victims of an offense. *State v. Stewart*, 3d Dist. No. 16-08-11, 2008-Ohio-5823, ¶9, citing *State v. Toler,* 174 Ohio App.3d 335, 338, 2007-Ohio-6967; *State v. Christy,* 3d Dist. No. 16-04-04, 2004-Ohio-6963, ¶16. "A victim of a crime is defined as the person or entity that was the 'object' of the crime." *State v. Samuels,* 4th Dist. No. 03CA8, 2003-Ohio-6106, ¶5, citing Black's Law Dictionary (5th Ed.1979) 1405. In certain circumstances, a government entity may be considered a victim of a crime under R.C. 2929.18(A)(1), for example, when government funds are embezzled or when government property is vandalized. Id. However, a government entity voluntarily advancing its own funds to pursue a drug buy through an informant is not one of

the scenarios contemplated by R.C. 2929.18(A)(1). See *State v. Pietrangelo,* 11th Dist. No. 2003-L-125, 2005-Ohio-1686, ¶12-15; *State v. Justice*, 5th Dist. No. 09-CA-66, 2010-Ohio-4781, ¶24, 30; *State v. Jones*, 7th Dist. Nos. 08 JE 20, 08 JE 29, 2010-Ohio-2704, ¶44; *State v. Collins*, 6th Dist. Nos. H-09-001, H-09-005, 2009-Ohio-6346, ¶52, *State v. Frazier* (Mar. 9, 2011), 4th Dist. No. 10CA15.

**{¶58}** In light of this plain error, we hereby vacate the order of restitution.

**{¶59}** Having found no error prejudicial to Taylor herein, in the particulars assigned and argued in her first three assignments of error, but having found error in the fourth assignment of error and plain error in the trial court's award of restitution, we affirm in part, and reverse in part, the judgment of the trial court, and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**